# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JANEAN CHAMBERS,

       Plaintiff,

    v.

KATHLEEN SEBELIUS, SECRETARY OF
HEALTH AND HUMAN SERVICES

       Defendant.

Civil Action No. 13-544 (CKK)

## MEMORANDUM OPINION
(December 31, 2013)

Plaintiff Janean Chambers brings this action against Defendant Kathleen Sebelius, in her official capacity as Secretary of Health and Human Services, alleging violations of Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973.[1] Presently before the Court is Defendant's [9] Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.[2] Upon consideration of the pleadings[3], the relevant legal authorities, and the record as a whole,

---

[1] Strangely, Defendant's filing lists "Eric H. Holder, Jr., U.S. Attorney General, U.S. Department of Justice" as the Defendant in this action. Defendant provides no explanation for why the Attorney General should be substituted for the Secretary of Health and Human Services in this action, and the Court thus disregards this difference in Defendant's captions as a typographical error.

[2] The Court notes that Defendant has titled her filing "Memorandum of Points and Authorities in Support of Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" without actually submitting a separate filing containing the motion this memorandum supports. However, because it is clear from Defendant's Memorandum that she moves the Court for an order dismissing Plaintiff's claims pursuant to Rule 12(b), or in the alternative, pursuant to Rule 56, the Court will construe this Memorandum as containing a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.

[3] Complaint, ECF No. [1] ("Compl."); Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss, or in the Alt., Mot. for Summ. J., ECF No. [9] ("Def.'s MSJ"); Def.'s Stmt. of Material Facts, ECF No. [9-1] ("Def.'s Stmt."); Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss, or in the Alt., Mot. for Summ. J., ECF No. [11] ("Pl.'s Opp'n"); Pl.'s Stmt. of Genuine Issues, ECF No.

the Court GRANTS Defendant's [9] Motion to Dismiss or, in the Alternative, for Summary Judgment. Accordingly, this action is DISMISSED WITH PREJUDICE in its entirety.

## I. BACKGROUND

### A. Factual Background

Plaintiff Janean Chambers is a 48 year-old blind African-American female who has worked for the Department of Health and Human Services ("DHHS") since 1989. Pl.'s Opp'n at 2. In 2006, Plaintiff became a GS-0343-09 Management Analyst in the Office of Information Services ("OIS") of the Administration for Children and Families ("ACF") within DHHS. Pl.'s Ex. 1 (Chambers Affidavit) at 1. In this capacity, from 2007 until July 2012, Plaintiff's duties included functioning as the Section 508 Coordinator for ACF. *Id.* at 3. Pursuant to 36 C.F.R. § 1194.1, every federal government agency must ensure that its employees with disabilities have comparable access to electronic data and information through the development, procurement, and maintenance of appropriate electronic and information technology. Accordingly, every operating division of DHHS has a Section 508 Coordinator with the responsibility for ensuring that employees with disabilities are accommodated such that they have equal access to electronic data and information. Pl.'s Ex. 7 (Curtis Deposition Excerpts) at 46:10-19. Plaintiff's supervisors in her GS-9 Management Analyst position were Jeanne Dionne and Michael Curtis. Pl.'s Ex. 1 at 1-2.

Plaintiff's GS-9 position was the full performance level of her position, meaning that it was the highest grade-level that she could be promoted to without either competing with other individuals for a new, advertised position or receiving a non-competitive promotion through her accretion of duties. *Id.* at 2. In 2007, Plaintiff became eligible for elevation to GS-11 and

[11-13] ("Pl.'s Stmt."); Def.'s Reply in Support of Mot. to Dismiss, or in the Alt., Mot. for Summ. J., ECF No. [13] ("Def.'s Reply").

inquired with her supervisors about obtaining a promotion to this grade level from her current position. *Id.* at 3. Plaintiff pointed out that all the other individuals functioning as Section 508 Coordinators in DHHS were paid at a higher grade than she was, ranging from GS-12 to GS-14. *Id.* at 4. In her brief, Defendant points out, and Plaintiff concedes, that there is no position description for a Section 508 Coordinator. Def.'s Stmt. ¶ 23 (citing Def.'s Ex. 10 (Decl. of Stuart Hoffman) ¶ 5); Pl.'s Stmt. at 8. Furthermore, Plaintiff does not deny that there is no grade level requirement for an individual with Section 508 Coordinator duties, and admits that the grade level of each designated Section 508 Coordinator is based upon the specific duties, responsibilities, and authorities granted the incumbent of that position. Def.'s Stmt. ¶¶ 25, 37 (citing Def.'s Ex. 10 ¶ 6); Pl.'s Stmt. at 8, 12. In this vein, Defendant further states that Section 508 responsibilities comprise a fraction of an individual's overall duties. Def.'s Stmt. ¶ 26 (citing Def.'s Ex. 10 ¶ 5). Nevertheless, Plaintiff states that all of her work time as a GS-9 was spent on her Section 508 Coordinator duties. Pl.'s Stmt. at 8 (citing Pl.'s Ex. 11 (Chambers Deposition Excerpts) at 4:11-17). She also points out that Jaime Robinson, a DHHS GS-12 IT employee in a different employment series with Section 508 Coordinator duties, stated in his deposition testimony that he did not have any role outside the Section 508 area. *Id.* at 8 (citing Pl.'s Ex. 8 (Robinson Deposition Excerpts) at 42:14-16).

In response to Plaintiff's requests to be elevated to a GS-11 position, Plaintiff was repeatedly informed by her supervisors, Mr. Curtis and Ms. Dionne, that they supported her promotion, believing that she was an excellent employee who had "blossomed" in her current position. Pl.'s Ex. 7 at 60:9-20; Def.'s Ex. 4 (Curtis Affidavit) at 3. However, they informed her that because her current position terminated at GS-9, in order to be promoted to a GS-11 position, she would have to compete for a GS-11 position that became available. In an affidavit

submitted to the EEO investigator reviewing Plaintiff's claim and in his deposition, Curtis repeatedly stated that he lacked the authority to promote Plaintiff in the absence of a vacancy, and that creation of such a position required the approval of his superiors in DHHS. Def.'s Ex. 4 at 2 ("I only have authority to promote someone in a career-ladder series, and she is not in a promotion allowed career ladder. So I did not have authority to promote her."); *id.* at 3 ("Her non-promotion was not based on her race or disability, but on no GS-11 opportunities being available to anyone."); *id.* at 2 ("The government process for promotion is that someone advertises a position and you compete for that. There are no GS-11 positions in my office to promote to."); Pl.'s Ex. 7 at 56:18-19 (Curtis stating that he lacked the authority to promote); *id.* at 60:13-15 (Curtis responding "Yes" to the question "You thought she was deserving of a promotion. You just had no way of doing that?"); *id.* at 100:4-5 (noting that vacancies are "approved by the assistant secretary."); *id.* at 62:10:19 (noting that the GS-11 was made available by the assistant secretary who "approves all promotion opportunities"). Dionne as well consistently stated that she lacked the authority to promote Plaintiff in the absence of a vacancy, which she did not have the power to create herself. Def.'s Ex. 5 at 2 (Dionne Affidavit) ("She did request a promotion. I informed her that I don't have promotion authority."); *id.* ("[s]he did [request a promotion] and informed [sic] her that I did not have the authority to promote her."); *id.* at 3 ("I did not discriminate against the Complainant based on her race and disability because I had no authority to promote her."); Pl.'s Ex. 6 (Dionne Deposition Excerpts) at 66:14-67:11 (stating that Dionne and Curtis lacked authority to promote and needed approval to advertise a position). In an e-mail summarizing a meeting between herself and Mr. Curtis and Ms. Dionne, Plaintiff stated that she understood them to lack the authority themselves to create the GS-11 position she sought, as they could only request such a position. Def.'s Ex. 13 (E-mail from J.

Chambers to J. Dionne and M. Curtis) ("From this meeting my understanding is that the opportunity for me to advance from a GS-9 to a GS-11 as the ACF Section 508 Coordinator is not available in ACF/OIS."). Curtis and Dionne informed Plaintiff that although they could request the vacancy she sought, even if the position were approved, Plaintiff would still need to apply for the position. *Id.* ("Michael stated that he will continue to push this opportunity for advancement because of my title. However, if the slot is approved it will be advertised and I will need to apply for the position."); Def.'s Ex. 15 (Rebuttal Affidavit of Janean Chambers) at 3-4 ("Mr. Curtis stated that even if and when he has [the] budget for it, that he will need to have an available slot at a higher grade in order to offer a GS-11 level for the Section 508 Coordinator position, *and* he will have to advertise that job vacancy *and* I will need to apply for it . . . . He expressed that he would continue to support me and push for me to be promoted."). Pl.'s Ex. 7 at 57:22-58:5 (Curtis stating "I would have to go back and ask for a [position] . . . It would have to be approved by the assistant secretary. And then they would have to compete. And they would have to select based on all the people that applied for it."). Curtis subsequently stated to Plaintiff that he had requested the creation of a GS-11 vacancy, but that the failure to create such a vacancy was due to a lack of budget for the position sought by Plaintiff. Pl.'s Ex. 7 at 83:15-84:5; Def.'s Ex. 15 at 3.

Plaintiff challenges this explanation for the lack of her promotion, arguing that the failure to promote her constitutes discrimination on the basis of race and disability. Primarily, she notes that other vacancies were created during the time period at issue and that these vacancies allowed other employees of DHHS the opportunity to advance beyond the full performance levels of their positions. Pl.'s Stmt. at 1-2. She points out that the OIS spent at least $206,431 to hire and/or increase the salaries of five white, non-disabled employees during the period when ACF alleges

that it lacked the budget to create a new GS-11 position to which she could apply to. *Id.* at 2. However, in alleging these facts, Plaintiff does not point to any GS-11 position created in OIS. Rather she points to the creation of other positions, including a GS-12 Management Analyst Position, a GS-14 Information Technology Specialist and three GS-15 Division Director Positions. Pl.'s Ex. 6 at 92:3-17 (noting that three GS-15 positions were filled with existing GS-14 employees); *id.* at 96:1-10 (discussing hiring for new GS-12 position); Pl.'s Ex. 7 at 87:7-88:9 (discussing hiring for GS-14 position). Moreover, Plaintiff does not suggest that these vacancies encompassed Section 508 Coordinator duties. Furthermore, Plaintiff does not offer evidence that Dionne and Curtis were seriously involved in the creation of these vacancies. Dionne states in her deposition testimony that she filed paperwork with the Human Resources Department to have the Information Technology Specialist position shifted to a GS-14 from the base level GS-13 because the newly hired employee, Terry Cheng, "ha[d] been working at a higher salary than the lowest step," and "[i]f the person has been working at a higher salary than the lowest step, they can request to be hired at a higher step within the grade." Pl.'s Ex. 6 at 47:6-18. However, according to Defendant, the GS-14 and GS-15 positions were created due to larger departmental needs identified by the Assistant Secretary. *See* Def.'s Att. 1 (Decl. of Michael Curtis) ¶ 7-8 (noting that Assistant Secretary David Hansell "conveyed to [Curtis] that in regard to OIS ACF positions, he felt it was necessary to fill the three Division Director positions at the GS-15 level, to prevent losing staff."); *id.* ¶ 8 (stating that the GS-14 Information Technological Specialist position was approved by Hansell in response to President Obama's emphasis on cyber security). In addition, the Court notes that the GS-12 position was only advertised in March and April 2012, shortly before the end of the time period at issue in this case, and that the individual selected for the position had an effective date of September 2012, well after the end of the time

at issue in this case. Def.'s Att. 3 (Decl. of Melissa Smith) ¶ 6; Pl.'s Ex. 9 (GS-12 Vacancy Posting).

In challenging her lack of promotion, Plaintiff also questions whether her supervisors ever actually requested the creation of a GS-11 vacancy. Pl.'s Stmt. at 2-3. She notes that ACF has not produced paperwork containing such a request and that Jason Donaldson, the Deputy Assistant Secretary for Administration at ACF during the time at issue, stated in an affidavit that Plaintiff requested a promotion from him during the informal EEO mediation held on January 4, 2012. *Id.* (citing Pl.'s Ex. 3 (Donaldson Affidavit) at 3). Plaintiff interprets this statement to mean that Donaldson did not receive any request to promote Plaintiff *until* the informal EEO mediation in this case on January 4, 2012 and thus Plaintiff's supervisors are untruthful when they state that they requested a vacancy to which she could be promoted. Pl.'s Opp'n at 4. Defendant vigorously disputes this assertion, pointing to multiple statements in the record showing that Plaintiff's supervisor, Michael Curtis, repeatedly requested the creation of a vacancy that she could be promoted to, even though he did not explicitly mention Plaintiff by name. *See, e.g.,* Pl.'s Ex. 7 at 62:18-19 ("I repeatedly asked for an -11 year after year after year."); *id.* at 82:20-83:14 (Curtis stating that he submitted the request and that "the request for an additional 508 position at a senior level was rejected."); Pl.'s Ex. 6 at 67:9-11 ("My recollection is that [Curtis] said he would talk with Jason Donaldson to see if he could be given the approval to advertise a position."); *id.* at 68:5-8 ("I remember in the meeting him saying that he was going to have a conversation with Jason Donaldson to see whether he could get approval to advertise a position."). Defendant further points to a declaration from Donaldson stating that Curtis requested the position sought by Plaintiff, albeit without referencing her by name. Pl.'s Att. 2 (Decl. of Jason Donaldson) ¶ 7 (Donaldson recalling that Curtis, although not mentioning

Plaintiff by name, "requested authority to create and then compete an administrative support position.").

Yet although no vacancy existed for Plaintiff to apply to, Plaintiff's supervisors explored an alternative means of promoting her. In response to Plaintiff's contention that she should be paid at a higher grade, Donaldson authorized a desk audit. Def.'s Stmt. ¶ 15; Pl.'s Stmt. at 7. "A desk audit is a process by which an employee may request 'her work to be reviewed.'" *Rand v. Secretary of the Treasury*, 816 F.Supp.2d 70, 72 n. 1 (D.D.C. 2011) (quoting *Williams v. Dodaro*, 806 F.Supp.2d 246, 249 n. 2 (D.D.C. 2011)). "'[I]f, in the eyes of the reviewers, that work is at a level higher than that at which the employee is currently graded, the employee will be promoted to the level' that is reflected by her performance." *Id.* "This is sometimes called an 'accretion of duties' promotion, because the desk audit is meant to trigger a promotion to match the employee's 'accretion of duties' over time." *Id.* The desk audit was conducted in early 2012 by Human Resources Specialist Rosalind Fortune. Def.'s Stmt. ¶ 15; Pl.'s Stmt. at 7; Def.'s Ex. 8 (Fortune Affidavit) at 2. Fortune met with Plaintiff and discussed her duties, spoke with Plaintiff's supervisor, Dionne, and used a set grade level criteria of nine factors to analyze Plaintiff's position. Def.'s Stmt. ¶ 16; Pl.'s Stmt. at 7. Fortune reviewed the following factors: knowledge required by the position, supervisory controls, guidelines, complexity, scope and effect, personal and purpose of contacts, physical demands, and work environment. Def.'s Stmt. ¶ 17; Pl.'s Stmt. at 7. After conducting an analysis of each of these factors, Fortune concluded that Plaintiff was properly classified at the GS-9 level. Def.'s Stmt. ¶ 18; Pl.'s Stmt. at 7. Wendy Hackley, a Supervisory HR Specialist, approved the desk audit's findings, concluding that given

Plaintiff's duties, she was properly classified at the GS-9 level.[4]  Def.'s Stmt. ¶ 19; Pl.'s Stmt. at

7.  Plaintiff is not challenging the results of the desk audit in this case.

Ultimately, in June 2012, in response to Plaintiff's requests for a promotion, the DHHS

did approve and create a GS-11 Management Analyst Position to which Plaintiff could apply.

Pl.'s Ex. 7 at 62:10-63:2.  When the position vacancy was advertised, the vacancy was restricted

to ACF employees.  *Id.* at 64:6-8.  Plaintiff applied for the position and was the only person in

ACF found to be qualified.  Pl.'s Ex. 6 at 69:13-70-4.  Plaintiff currently serves in this GS-11

Management Analyst position.

### B.  Procedural Background

Plaintiff filed suit in this Court on April 23, 2013, alleging violations of Title VII of the

Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42

U.S.C. §§ 2000e *et seq.*, and the Rehabilitation Act of 1973, as amended by the U.S. Department

of Health and Human Services.  *See* Compl. ¶ 1.  She alleges that Defendant's failure to promote

her as early as 2007 constitutes discrimination on the basis of her race (African-American) and

her physical handicap (blindness).  Defendant subsequently filed her [9] Motion to Dismiss, or in

the Alternative, Motion for Summary Judgment.

## II. LEGAL STANDARD

Defendant's motion seeks dismissal for failure to state a claim, or in the alternative,

summary judgment.  Pursuant to Fed. R. Civ. P. 12(d), "if, on a motion under Rule 12(b)(6) . . .

matters outside the pleadings are presented to and not excluded by the court, the motion must be

treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a

---

[4] While Plaintiff appealed the desk audit's findings, this appeal was cancelled when
Plaintiff applied for and was selected for a GS-11 position at ACF, as an employee cannot appeal
the classification of apposition to which they are not officially assigned.  Def.'s Stmt. ¶ 20 (citing
5 C.F.R. § 511.603); Pl.'s Stmt. at 7 (same).

reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003). Here, both parties have presented matters outside of the pleadings in support of their positions. Accordingly, the Court will review Defendant's entire motion under the summary judgment standard, because "the [defendant's] motion[] [was] in the alternative for summary judgment and . . . the parties had the opportunity to submit and submitted materials in support and in opposition." *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1273 n. 5 (D.C. Cir. 1997) (determining that it would not be "unfair" to treat such a motion as one for summary judgment).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that she] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of her position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.

*Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

### III. DISCUSSION

Title VII of the Civil Rights Act makes it unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may

be discriminated against by a federal agency "solely by reason of his or her disability." 29 U.S.C. § 794(a). The Rehabilitation Act further states that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under [provisions of] the Americans with Disabilities Act [ADA]." *Id.* § 794(d). The ADA bars discrimination against a "qualified individual on the basis of disability in regard to . . . conditions [ ] and privileges of employment," including "advancement," 42 U.S.C. § 12112(a).

Where, as here, a plaintiff offers no direct evidence of discrimination, Title VII and Rehabilitation Act claims are assessed pursuant to a burden-shifting framework initially set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). *See Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 16-17 (D.C. Cir. 2009) (noting that *McDonnell Douglas* framework also applies to claims under the Rehabilitation Act). Pursuant to that framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination or retaliation. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). Then, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [adverse employment action].' " *Id.* at 253 (quoting *McDonnell Douglas,* 411 U.S. at 802).

However, in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), the D.C. Circuit simplified the analysis for Title VII disparate treatment suits. Under *Brady*, once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court must simply determine whether the plaintiff has put forward enough evidence to defeat the proffer and support a finding of retaliation. *See Brady,* 520 F.3d at 494 ("[W]here an employee has suffered an adverse employment action and an employer has

asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.") (emphasis in original).  Consequently, at the summary judgment stage, a district court is left with "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.  See also Kersey*, 586 F.3d at 17 n.2 (applying *Brady* in case involving the Rehabilitation Act).   "In other words, the Court must determine if the plaintiff has produced enough evidence such that a reasonable jury would find that the Department's non-discriminatory reasons are mere pretext for underlying unlawful discrimination." *Perry v. Donovan*, 733 F.Supp.2d 114, 118 (D.D.C. 2010).

Yet "[w]hile *Brady* directs the district court's focus to the employer's proffered non-discriminatory reason, the Court still first must determine whether plaintiff has suffered an adverse employment action." *Adesalu v. Copps*, 606 F.Supp.2d 97, 103 (D.D.C. 2009).  *See Evans v. Sebelius*, 716 F.3d 617, 619 (D.C. Cir. 2013) (noting that an adverse action is a prerequisite for a Title VII claim) (citing *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003)); *Patterson v. Johnson*, 505 F.3d 1296, 1298 (D.C. Cir. 2007) ("Liability for discrimination under Title VII requires an adverse employment action.") (citing *Brown v. Brody*, 199 F.3d 446, 452-55 (D.C. Cir. 1999)); *Perry*, 733 F.Supp.2d at 118 ("Before the Court can undertake [the *Brady*] inquiry, however, the Court must determine whether the alleged acts of discrimination constitute adverse employment actions.").  *See also Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (stating that an adverse employment action is an essential element of a discrimination claim under the Rehabilitation Act).

"An 'adverse employment action' is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003). "An employee must 'experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" *Id.* (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). The D.C. Circuit has cautioned that "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). Indeed, in this respect, "courts are not 'super-personnel department[s] that reexamine[] an entity's business decision[s].'" *Stewart v. Ashcroft*, 352 F.3d 422, 429 (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).

Here, Defendant argues that Plaintiff has failed to suffer an adverse employment action. Def.'s MSJ at 4-6; Def.'s Reply at 3-4. In her complaint, Plaintiff alleges that Defendant failed to promote her in violation of Title VII and the Rehabilitation Act. As Defendant points out, and Plaintiff appears to concede, Plaintiff position terminated at the GS-9 grade level. Def.'s Stmt. ¶ 1; Pl.'s Stmt. at 4. Therefore, the only way for Plaintiff to be promoted was either for her to apply for a vacancy announcement or to have her position upgraded via a desk audit. A desk audit requested by Plaintiff's supervisors and ordered by Jason Donaldson, the Deputy Assistant Secretary of DHHS, concluded that Plaintiff was properly classified as a GS-9 and the results of this audit are not challenged here. Consequently, in order to be promoted, Plaintiff needed to apply for a vacant position open to competition. In the absence of a rejected application for an available position, Defendant contends, there is no adverse employment action. Def.'s MSJ at 5.

In addressing failure to promote claims in employment discrimination cases, courts in this Circuit have focused on the need for showing an available position for which promotion was denied.[5] *See, e.g., Yarber-Butler v. Billington*, 53 Fed. Appx. 120, 120 (D.C. Cir. 2002) ("Failure to promote is generally an adverse action . . . but not if there is no open position."); *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (to establish a *prima facie* case for non-selection, plaintiff must show there was a "vacancy in the job sought."); *Hayslett v. Perry*, 332 F.Supp.2d 93, 100 (D.D.C. 2004) ("Lacking evidence of an available position, plaintiff cannot establish a prima facie case of employment discrimination based on non-promotion."). Such a principle makes practical sense. The existence of a vacancy signals that a plaintiff's supervisor has been provided the authorization to appoint someone to the position plaintiff seeks. The failure to exercise this authority to promote a plaintiff in a protected class thus can constitute an adverse employment action actionable in an employment discrimination claim. However, where no vacancy exists, a supervisor less clearly possesses the authority to promote an employee above the highest level of a career ladder position. Thus, the failure to promote in the absence of an available position, while frustrating to a plaintiff, does not necessarily constitute an adverse employment action.[6] *See Glass v. Lahood*, 786 F.Supp.2d 189, 220 (D.D.C. 2011) ("a plaintiff

---

[5] Courts in this Circuit have applied the same standard in assessing adverse employment actions under Title VII and the Rehabilitation Act, *see, e.g. Norris v. Salazar*, 885 F.Supp.2d 402, 419-420 (D.D.C. 2012), and neither party argues that a different standard governs the two statutes.

[6] *Perry v. Donovan*, 733 F.Supp.2d 114 (D.D.C. 2010) represents a limited exception to this principle, holding that a vacancy is not a prerequisite for a failure to promote claim when the employee is challenging a lack of promotion based on an accretion of duties, for which no vacancy would necessarily be required. In *Perry*, the plaintiff's career ladder position capped her grade level at GS-11. *Id.* at 116. Thus, as here, in order to reach GS-12, plaintiff had to apply for an available GS-12 position or request a desk audit. *Id.* Since there were no available GS-12 vacancies, plaintiff requested a desk audit, which determined that plaintiff was actually working at a GS-12 grade level. *Id.* However, the plaintiff's supervisor challenged the results of the desk audit, and after this supervisor submitted additional information, plaintiff's position was

pursuing a failure-to-promote claim in this Circuit . . . must ordinarily establish that there was an available position") (citing *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).

Perhaps recognizing this limit on the scope of adverse employment actions, Plaintiff attempts to frame her argument more broadly. She contends that where an employer regularly creates vacancies as a means of promoting its employees and told an employee that it was working on doing so for her, the failure to create and advertise that position constitutes an actionable adverse employment action. Pl.'s Opp'n at 10-12. Here, Plaintiff points out that her supervisors led her to believe that they were pushing for the creation of a GS-11 position to which she could apply. *Id.* at 4. Further, Plaintiff points out that other vacancies (although not at the GS-11 level) were created during the time at issue allowing other OIS employees to be promoted or hired at levels above GS-11. *Id.* at 5-8; Pl.'s Stmt. at 3-4. Plaintiff argues that together these facts render the failure to promote *her* an adverse employment action, even though no position existed for her supervisors to appoint her to. In essence, Plaintiff argues that her supervisors *did* have the authority to promote her, even in the absence of a vacant position.

Yet Plaintiff's argument is unavailing. In *Adesalu v. Copps*, 606 F.Supp.2d 97 (D.D.C. 2011), Judge Paul L. Friedman faced an almost identical situation to this and concluded that no

---

re-evaluated and a second desk audit determined that plaintiff was actually performing GS-11 work. *Id.* at 116-117. In response, plaintiff brought suit, arguing that her supervisor's challenge to the first desk audit "was discriminatory because it resulted in the reversal of the findings of the first desk audit and foreclosed the opportunity for plaintiff to attain promotion." *Id.* at 117. The court concluded that plaintiff had suffered an adverse employment action despite the lack of a vacant position to which she could apply, noting that where a "plaintiff requested a desk audit and presented evidence of work product sufficient to warrant a promotion, the plaintiff could . . . overcome the lack of vacancy and establish[] an adverse employment action." *Id.* at 119. Accordingly, *Perry*'s finding of an adverse employment action in the absence of a vacancy was based on the fact that the "[p]laintiff . . . requested a desk audit and presented sufficient evidence to be considered for a promotion." *Id.* That result is not applicable here, as a desk audit concluded that Plaintiff was properly classified as a GS-9 and she does not challenge the results of this desk audit in this Court.

adverse employment action had occurred. In *Adesalu,* an African-American Nigerian economist at the Federal Communications Commission sought promotion from the GS-13 level, which was the full performance level of his position. *Id.* at 99. Like Plaintiff Chambers here, in order "to obtain promotion to the GS-14 level, plaintiff either had to (1) apply for a competitive vacancy and be selected, or (2) request a desk audit to determine whether he is performing work at the GS-14 level and, if so, request that he be promoted non-competitively." *Id.* While no desk audit was conducted, Plaintiff indicated his interest in promotion via vacancy to his supervisors. In response, one of his supervisors "made a promise that plaintiff could be promoted within two years depending on the quality of his work." *Id.* After Mr. Adesalu was subsequently informed by his supervisors that he would not be promoted (ostensibly in violation of this promise), he brought suit, alleging that the failure to promote him was based on his race and national origin. *Id.* In challenging the failure to promote, he noted that other economists at the FCC, all of whom were not black or Nigerian, were being simultaneously promoted while he remained in his current position. *Id.*

Considering the plaintiff's claim based on his supervisor's statement, Judge Friedman concluded that plaintiff had failed to show an adverse employment action with respect to the denial of his promotion. *Id.* at 102-04. The court noted that "defendant has proffered undisputed evidence that there were no vacant positions for competitive promotion to GS-14 Industry Economists during the relevant time period. The other employees who were promoted were either promoted to a different grade (GS-15), or were on a different career ladder, and thus were eligible for non-competitive promotion to GS-14." *Id.* at 103 (internal citations omitted). So too here, Plaintiff has not put forward any evidence that there was a vacancy for the GS-11 position she sought. And while other employees within OIS were promoted, Plaintiff does not state that

any of these promotions were made to GS-11, the grade level she herself sought. Rather, these vacancies were created at the GS-12, GS-14, and GS-15 levels, and none of these positions involved Section 508 Coordinator duties. Further, Defendant has provided evidence that the GS-14 and GS-15 positions were created to address larger departmental needs and that the GS-12 position was advertised and filled only at the conclusion of the time at issue in this case. *See* Def.'s Att. 1 ¶ 7-8 (noting that Assistant Secretary David Hansell "conveyed to [Curtis] that in regard to OIS ACF positions, he felt it was necessary to fill the three Division Director positions at the GS-15 level, to prevent losing staff."); *id.* ¶ 8 (stating that the GS-14 Information Technological Specialist position was approved by Hansell in response to President Obama's emphasis on cyber security); Def.'s Att. 3 ¶ 6. Thus, as in *Adesalu*, "Plaintiff has proffered no evidence to show that there was a vacant position for which [s]he was eligible in the time period for which [s]he administratively exhausted [her] claims." 606 F.Supp.2d at 103. Accordingly, "Plaintiff could not have suffered an adverse employment action for failure to promote when there were no available vacancies." *Id.*

In reaching this conclusion, Judge Friedman also rejected the plaintiff's claim that his supervisor's promise to promote him and subsequent failure to act on this promise rendered the failure to promote in the absence of a vacant position an adverse employment action. On this point, the court concluded that "[e]ven if Mr. Woock did promise plaintiff that plaintiff would be promoted, and later rescinded that promise, Mr. Woock *never had the authority* to fulfill this promise; thus defendant's maintenance of plaintiff at his current grade is not an adverse employment action." *Id.* (emphasis added).

Here, Plaintiff argues that there is a genuine issue of material fact as to whether her supervisors had the authority to promote her, which would appear to distinguish this case from

*Adesalu.*  Pl.'s Opp'n at 10-12; Pl.'s Stmt. at 3-4, 6.  Plaintiff contends a jury could find that when Plaintiff's supervisors decided to promote one of their subordinates, they were able to gain approval for the creation of a vacant position designed for the promotion of that employee.  Pl.'s Stmt. at 3-4, 6.  Yet the Court's review of the record shows that there is no genuine issue as to this fact.  Plaintiff's supervisors, Michael Curtis and Jeanne Dionne, have repeatedly and consistently stated that they lacked the authority to promote her or unilaterally create the position she sought.  Def.'s Ex. 4 at 2 ("I only have authority to promote someone in a career-ladder series, and she is not in a promotion allowed career ladder.  So I did not have authority to promote her."); *id.* at 3 ("Her non-promotion was not based on her race or disability, but on no GS-11 opportunities being available to anyone."); Def.'s Ex. 5 at 2 ("She did request a promotion.  I informed her that I don't have promotion authority."); *id.* ("[s]he did [request a promotion] and informed [sic] her that I did not have the authority to promote her."); *id.* at 3 ("I did not discriminate against the Complainant based on her race and disability because I had no authority to promote her."); Pl.'s Ex. 7 at 56:18-19 (Curtis stating that he lacked the authority to promote); *id.* at 60:13-15 (Curtis responding "Yes" to the question "You thought she was deserving of a promotion.  You just had no way of doing that?").  Rather, they have made clear that the creation of a vacancy is a process that requires the approval of their superiors in DHHS.  Def.'s Ex. 4 at 2 ("The government process for promotion is that someone advertises a position and you compete for that.  There are no GS-11 positions in my office to promote to."); Pl.'s Ex. 6 at 66:14-67:11 (stating that Dionne and Curtis lacked authority to promote and needed approval to advertise a position); Pl.'s Ex. 7 at 100:4-5 (noting that vacancies are "approved by the assistant secretary."). Indeed, as noted, in an e-mail summarizing a meeting between herself and Mr. Curtis and Ms. Dionne, Plaintiff stated that she understood them to lack the authority

themselves to create the GS-11 position she sought, as they could only request such a position. Def.'s Ex. 13 ("From this meeting my understanding is that the opportunity for me to advance from a GS-9 to a GS-11 as the ACF Section 508 Coordinator is not available in ACF/OIS."). At most, the record reveals that Mr. Curtis and Ms. Dionne possessed the authority to request from their superiors that a vacancy be created, as well as the authority to fill a vacancy created in their division. *See id.* ("Michael stated that he will continue to push this opportunity for advancement because of my title. However, if the slot is approved it will be advertised and I will need to apply for the position."); Def.'s Ex. 15 at 3-4 ("Mr. Curtis stated that even if and when he has [the] budget for it, that he will need to have an available slot at a higher grade in order to offer a GS-11 level for the Section 508 Coordinator position, *and* he will have to advertise that job vacancy *and* I will need to apply for it . . . . He expressed that he would continue to support me and push for me to be promoted."). Pl.'s Ex. 7 at 57:22-58:5 (Curtis stating "I would have to go back and ask for a -13 slot . . . It would have to be approved by the assistant secretary. And then they would have to compete. And they would have to select based on all the people that applied for it."). However, the record does not support the conclusion that Plaintiff's supervisors had the authority to *create* the position she sought.

In arguing that a genuine issue of material fact exists with respect to this point, Plaintiff contends that the eventual creation of a GS-11 position to which she could be promoted shows that her supervisors had the authority to promote her all along. Pl.'s Opp'n at 7. Yet, again, the record shows that approval for the creation of this eventual GS-11 position came from the Assistant Secretary, and not from Plaintiff's supervisors. *See* Pl.'s Ex. 7 at 62:10:19 (noting that the GS-11 was made available by the assistant secretary who "approves all promotion opportunities"). That this action was taken at the urging of Curtis does not support Plaintiff's

argument. Rather, this is consistent with the conclusion that Plaintiff's supervisors could, and did, request a vacancy that would function as an upgraded version of a current employee's position, but could not create one. *Id.* (Curtis noting that the GS-11 slot opened after he "repeatedly asked for an -11 year after year after year. And it was finally approved at that time.") *id.* at 83:11-14 ("The way the process works is you don't actually create a position for an individual. You just simply create a position. So the request for an additional 508 position at a senior level was rejected."). Furthermore, the fact that other vacancies were created that allowed other ACF employees to be promoted during the time at issue does not support Plaintiff's claim that her supervisors had the authority to create these positions. Plaintiff points to nothing in the record to show that the other vacancies were *created* as a result of Curtis and Dionne's actions. Indeed, Defendant has put forth evidence that the GS-14 and GS-15 vacancies were created due to larger departmental needs identified by the Assistant Secretary. *See* Def.'s Att. 1 ¶ 7-8 (noting that Assistant Secretary David Hansell "conveyed to [Curtis] that in regard to OIS ACF positions, he felt it was necessary to fill the three Division Director positions at the GS-15 level, to prevent losing staff."); *id.* ¶ 8 (stating that the GS-14 Information Technological Specialist position was approved by Hansell in response to President Obama's emphasis on cyber security). Further, Defendant has proffered evidence that the GS-12 position was advertised and filled only at the conclusion of the time at issue in this case. Def.'s Att. 3 ¶ 6. In light of this evidence, Plaintiff's claim that these vacancies functioned as *de facto* promotions that were created by her supervisors has no basis in fact and is mere speculation insufficient to defeat Defendant's motion for summary judgment.

Similarly unavailing is Plaintiff's argument that a genuine issue of material fact exists as to whether her supervisors even requested the vacancy she sought. Pl.'s Stmt. at 2-3. The

statements in the record show that Plaintiff's supervisor Michael Curtis *did* request his vacancy, albeit without mentioning Plaintiff by name. *See, e.g.,* Pl.'s Ex. 7 at 62:18-19 ("I repeatedly asked for an -11 year after year after year."); *id.* at 82:20-83:14 (Curtis stating that he submitted the request and that "the request for an additional 508 position at a senior level was rejected."). Plaintiff attempts to cast doubt on these statements by pointing to Donaldson's statement that Plaintiff requested a promotion from him during the informal EEO mediation held on January 4, 2012. Pl.'s Ex. 3 at 3. Plaintiff argues that this means that Donaldson did not receive any request to promote Plaintiff *until* the informal EEO mediation in this case on January 4, 2012. Yet, as Defendant points out, this statement, even when read as Plaintiff suggests, does not show that Plaintiff's supervisors failed to request a vacancy on her behalf and that their deposition testimony is thus untruthful. Rather, read in the context of Donaldson's other statements in the record, this account is consistent with the fact that Curtis did request a vacancy on behalf of Plaintiff, but did not refer to her by name in making this request. Def.'s Att. 2, ¶ 7 (Donaldson stating that Curtis "did not ask for any position for the Plaintiff, rather, he requested authority to create and then compete an administrative support position"). Indeed, Plaintiff points to no statement from Donaldson that he *never* received a request for a GS-11 vacancy from Curtis. Without statements from Donaldson undermining Curtis and Dionne's representations, all Plaintiff can point to in order to show a genuine issue of material fact is her contention that ACF has failed to produce the paperwork documenting these vacancy requests. But standing alone without any showing that Plaintiff has even requested this information, or evidence as to DHHS's submission and recordkeeping regime as to promotion requests, such unadorned speculation is insufficient to create more than a "metaphysical doubt" as to the issue of whether Plaintiff's supervisors actually requested a vacancy. *Matsushita*, 475 U.S. at 586. Furthermore,

even if true, the failure to produce this paperwork is not inconsistent with Plaintiff's supervisors making the requests for vacancies orally. *See* Pl.'s Ex. 6 at 67:9-11 ("My recollection is that [Curtis] said he would *talk* with Jason Donaldson to see if he could be given the approval to advertise a position.") (emphasis added); *id.* at 68:5-8 ("I remember in the meeting him saying that he was going to *have a conversation* with Jason Donaldson to see whether he could get approval to advertise a position.") (emphasis added); Pl.'s Att. 2, ¶ 7 (Donaldson stating that Curtis made his requests for vacancies orally).

Accordingly, finding no genuine issue of material fact as to (1) whether Plaintiff's supervisors lacked the authority to promote her, and (2) whether Plaintiff's supervisors requested a vacancy on her behalf, the Court views this case as identical to *Adesalu*. And just as in that case, unfulfilled promises by Plaintiff's supervisors that they were working to secure her a promotion do not create an adverse employment action in the absence of a vacancy. In order to obtain approval to advertise a vacancy for the position Plaintiff sought, Plaintiff's supervisors had to make a request to the Assistant Secretary of DHHS for authority to create a position. Thus, just as with the supervisor in *Adesalu*, Plaintiff's supervisors lacked the authority to create the vacancy they requested for her without the approval of higher-level DHHS employees. Accordingly, their requests to promote her to a position they could not themselves create, although unsuccessful in the time frame at issue, do not render her failure to be promoted an actionable adverse employment action.

Plaintiff cites two D.C. Circuit cases in arguing that the failure to create a vacancy for which an employee can apply can constitute an adverse employment action. Pl.'s Opp'n at 11-12. However, neither of these cases extends as far as Plaintiff suggests. First, in *Cones v. Shalala*, 199 F.3d 512, 518 (D.C. Cir. 2000), the D.C. Circuit held that the decision not to

*advertise* a vacant position can constitute an adverse employment action. In that case, the plaintiff challenged the defendant's decision to laterally transfer a white employee into the position plaintiff sought promotion to, rather than open the position to competition. *Id.* at 516. Despite the fact that defendant never opened the position to competition, the D.C. Circuit found that the plaintiff had still suffered an adverse employment action because "refusing to allow [plaintiff] to compete for the promotion was tantamount to refusing to promote him." *Id.* at 521. Here, the facts are different in a crucial respect. Defendant here has not created a GS-11 position and sought to shield it from competition by laterally transferring another employee in without advertising a vacancy. Rather, as discussed, the position that Plaintiff sought *did not exist* during the time at issue and her supervisors lacked the authority to create it. Plaintiff could not compete for a position that did not exist. Indeed, *Cones* itself recognized the necessity of a vacancy in establishing an adverse employment action for failure to promote. *See id.* at 516 (noting that one of the "most common nondiscriminatory reasons for a plaintiff's rejection" is "the absence of a vacancy in the job sought.") (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n. 44 (1977)); *id.* at 517 (noting the D.C. Circuit's "clear statements" in prior cases "that plaintiffs in non-selection cases need show only that they applied for the *vacant* position and that a person not of their protected class was selected.") (emphasis added). *See also Yarber-Butler*, 53 Fed. Appx. at 120 (citing *Cones*, 199 F.3d at 516, for the proposition that "if there is no vacancy in the job sought, the plaintiff cannot establish a prima facie case.") (internal citations omitted).

Similarly, Plaintiff's citation to *Evans v. Sebelius*, 716 F.3d 617 (D.C. Cir. 2013) is unavailing. In that case, the defendant created a position and opened it to competition. However, after the plaintiff applied and was interviewed for the position, the vacancy was

cancelled. *Id.* at 618-19. Finding the Government's explanation for the cancellation of the position inaccurate and inconsistent, and noting the fact that white employees were simultaneously promoted, the D.C. Circuit overturned the district court's grant of summary judgment to the defendant. *Id.* at 622. *Evans* is distinct from the facts here, as no GS-11 vacancy to which Plaintiff could apply existed during the time at issue and Plaintiff's supervisors lacked the authority to unilaterally create one. By contrast, in *Evans*, a vacancy existed and the plaintiff's supervisors there had the authority to promote plaintiff.

Consequently, under Circuit case law, there is no adverse employment action here. Plaintiff points to Defendant's failure to promote her, but absent an available vacancy to which Plaintiff could have applied, or at least a showing that her supervisors had the authority to create such a vacancy and failed to request it, there is no adverse employment action. Under *Adesalu*, Plaintiff cannot challenge the failure to be promoted to a position which did not exist and which her supervisors, while utilizing their power to request, lacked the power to unilaterally create.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's [9] Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. Accordingly, this action is DISMISSED WITH PREJUDICE in its entirety. An appropriate Order accompanies this Memorandum Opinion.


Dated: December 31, 2013

___/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
